PARK DISTRICT OF HIGHLAND PARK, Petitioner-Appellant, v. LA SALLE NATIONAL BANK et al., Defendants-Appellees.

Second District (1st Division) No. 74-269

Opinion filed February 25, 1976.

Righeimer, Righeimer and Martin, of Chicago, and Robert Weber, of Highland Park (Frank S. Righeimer, Jr., and Leo N. Cinquina, of counsel), for appellant.

Morrison & Nemanich, of Waukegan, for appellees.

Mr. JUSTICE GUILD delivered the opinion of the court:

The Park District of Highland Park filed a petition on June 29, 1971, to condemn lots 39 and 40 in Block 1 of the First Addition of Ravinia Highlands in Highland Park, owned by Maria C. Orrico and her family. On March 1, 1972, the Orricos filed a counterclaim alleging that such a taking would cause damage to adjacent lots 37 and 38, which they also owned. After negotiations, the Park District decided to increase the taking and filed a petition to condemn the alleged damaged portions of the adjacent lots. The main question presented to the jury was the fair cash market value of the lots taken as of the agreed upon valuation date, January 11, 1974. After a trial in which the jury viewed the property, the trial court entered judgment on the jury's verdict in the amount of $68,000, from which the Park District has prosecuted this appeal.

At the date of valuation, January 11, 1974, the property in question, hereinafter referred to as lots 37, 38, 39 and 40, was an irregular, somewhat "T" shaped parcel of vacant land consisting of approximately 1½ acres situated in Highland Park. The following map diagrams the subject property:

The contour lines of the lots slope gradually down from Pleasant Avenue to a ravine (located approximately 300 feet from Pleasant Avenue, which runs through lots 38, 39 and 40) where the land suddenly drops off 8 to 12 feet for about 75 feet and then returns to the original height and gradually slopes upward to the Chicago & Northwestern Railroad tracks located at the rear of the property. All of the lots conform to the existing zoning, "D" single-family residential, which requires a minimum lot size of 7,260 square feet, minimum lot depth of 125 feet and a minimum amount of table land per lot. Neither the use nor the size of these lots had changed in any respect for a number of years, nor had the Orricos ever contemplated resubdividing the lots.

Lot 37 is divided into three separate lots, all of which front on Bellevue Place. The Orricos only own the middle 151.75 feet of that lot. The Orricos own all of lot 38. However, in their counterclaim they failed to allege any damages to the first 150-foot area east of Pleasant Avenue. The Orricos also own all of lots 39 and 40. Lots 38, 39 and 40 all front on Pleasant Avenue. The property sought to be condemned by the Park District consists of the middle 151.75 feet of lot 37, the rear 313.65 feet of lot 38 and all of lots 39 and 40.

At the trial on January 28, 1974, both parties agreed that the highest and best use of the lots was single-family residential, as zoned. The only issue raised was the number of new lots that could be developed

from the existing lots for single-family residential use which would comply with the existing zoning.

The Park District called two expert witnesses who testified that the property in question could be resubdivided into five lots: two 50-foot lots on Pleasant Avenue and one 51.75-foot lot and two 50-foot lots on Bellevue Place. They testified that they took into consideration the frontage of the property on Pleasant Avenue and Bellevue Place, the total area of the site, the topography, the marketing conditions in the neighborhood, the demand for vacant lots, the probability of obtaining a permit to divide the property, the zoning ordinance and the feasibility of costs involved in developing the parcel. They respectively testified that, in their opinion, the fair cash market value of the property sought to be condemned was $41,300 and $42,000.

The first witness called by the defendants was Charles Greengard, a consulting engineer who has had experience in laying out plats of subdivisions within the city of Highland Park. He testified that one week before the trial the defendants' attorney approached him seeking to have him prepare a preliminary plat resubdividing the existing lots. Over the objection of defense counsel, the witness was allowed to testify that he did prepare a plat in compliance with existing zoning, dividing the existing lots into eight new lots and the plat was then admitted into evidence.

The Orricos called two expert witnesses who were professional appraisers who, relying heavily upon the Greengard plat in valuing the property, testified that the existing lots could be resubdivided into eight new lots which would conform to the existing zoning. The factors that the witnesses took into consideration in reaching their results were the size of the lots, the existing zoning and other sales in the area. Their respective opinions as to the fair cash market value of the property on January 11, 1974, were $80,000 and $81,000.

At the close of defendant's case, the Park District called Margaret M. Sachs as a rebuttal witness. She testified that she was a resident of Highland Park for over 28 years and presently serves as chairman of the Highland Park Plan Commission. She stated that the Greengard plat was not in conformity with the "D" zoning classification because five of the lots did not conform to the minimum lot depth regulation of 125 feet, that the road easements shown on the plat presented fire protection problems and that there may be violations of the table land requirement with respect to at least one of the lots. She concluded that she did not see how the Plan Commission could approve the Greengard plat. She based her opinion of the fact that in the nine years she had served

on the Plan Commission she knew of only one instance where the minimum lot depth requirement was waived and that was a matter of a one-foot variation.

It was the opinion of the trial court that:

> "The problem here for the jury to decide in determining the valuation is going to ultimately result in whether they find it can be put into more than 5 lots. If that's true, I think that can be a jury question."

The trial court, therefore, allowed the Greengard plat and the testimony of defendants' experts concerning it to be admitted into evidence over the objections of the Park District and subsequently denied the Park District's motion to have that evidence struck and withdrawn.

On appeal the Park District contends that the jury was misled by the numerous incorrect rulings of the trial court on the admission of the Greengard plat and the testimony concerning it; by the trial court's refusal to give written instructions limiting the use of the Greengard plat and the testimony concerning it; and by the prejudicial remarks of the trial judge and by the prejudicial conduct, remarks and argument of the counsel for the defendants.

■■ This court is aware of the numerous cases dealing with admissibility of exhibits purporting to show a possible future use of property sought to be condemned. Most of these cases deal with contemplated structures on the premises in question or contemplated usage, such as development by lakes or contouring. (*Chicago & Evanston R.R. Co. v. Blake* (1886), 116 Ill. 163, 4 N.E. 488; *Department of Public Works v. Chicago Title & Trust Co.* (1951), 408 Ill. 41, 95 N.E.2d 903.) We do not find these cases to be controlling. In *Sexton v. Union Stockyard & Transit Co.* (1902), 200 Ill. 244, 65 N.E. 638, the Union Stockyard and Transit Company sought to condemn property owned by Patrick J. Sexton *et al.* The court allowed oral evidence to be introduced by Sexton for the purpose of showing the adaptability of their land for the building of warehouses and railroad yards. However, the court refused to admit a map or plat "prepared by the appellants or under their direction showing the possible contemplated future development of the property." The trial court had refused to admit the map or plat and the Supreme Court, in affirming, stated:

> "In *Chicago and Evanston Railroad Co. v. Blake*, 116 Ill. 163, we held that the plans of a structure which the owner of land sought to be condemned had contemplated, for a number of years, erecting on the premises, might be received in evidence as an illustration of one of the uses to which the property was adapted, if its introduction was expressly limited by the court to

that object, but that such testimony was inadmissible to enhance the damages. We also there said that the practice of introducing such evidence should not be encouraged, as it was more likely to mislead than to enlighten the jury. The map or plat sought to be introduced in the case at bar was not of any building or structure that the appellants had contemplated erecting, but a mere plat or plan of a possible, and largely imaginary, development of the tract. Oral testimony had been received as to the adaptability of the property for such use, and we think the court properly declined to admit the plat or plans in evidence." *Sexton v. Union Stockyard & Transit Co.* (1902), 200 Ill. 244, 248-49, 65 N.E. 638, 639-40.

In *Martin v. C. & M. Electric R.R. Co.* (1906), 220 Ill. 97, 102, 77 N.E. 86, 88, the Supreme Court stated:

"As to the plans offered in evidence showing a certain manner of subdividing the tracts in question into lots, these were merely illustrative of the testimony of the particular witness and calculated to give undue weight and prominence to his testimony."

The court went on and, in quoting *Sexton v. Union Stockyard Co.*, held that the court properly declined to admit the plat or plans into evidence. In the case of *Forest Preserve District v. Wallace* (1921), 299 Ill. 476, 485, 132 N.E. 444, 447, the Supreme Court stated that it was proper to exclude from evidence a plat of a proposed subdivision when: (1) the plat was not of record; (2) the land was not surveyed into lots according to the plat; (3) there was no certainty that it would be or had become an actual plat of that land; and (4) where the plat was not even contemplated or made before suit was brought. We find the reasoning in this case is applicable to the instant case.

■■ In the case before this court the Greengard plat was not recorded, the land was not surveyed into lots according to the plat, there was no certainty that it would ever become an actual plat of the land, and the plat was made only one week before the trial and almost three years after the condemnation suit was commenced. Furthermore, we note that the Park District conceded that the highest and best use of the lots was single-family residential and therefore the sole purpose of introducing the plat into evidence was to enhance the damages by showing that eight single-family dwellings would be a more profitable investment than five. Thus, under the authority cited above, evidence sought to be introduced for that purpose is clearly incompetent. We also note that the issue of how many single-family dwellings could be lawfully built, *e.g.*, compliance with zoning ordinances, on the property was a question of law for the trial court, not for the jury, and, that as a

matter of law the Greengard plat did not conform to the existing zoning. We therefore hold that the trial court erred in admitting the Greengard plat into evidence for the above stated reasons.

This court having found that the trial court committed a reversible error in admitting the Greengard plat, it is unnecessary for us to consider any of the other contentions of the Park District. Judgment of the trial court is therefore reversed and remanded with instructions to hold a new condemnation hearing to determine the fair market value of the property in question as of January 11, 1974.

Reversed and remanded with instructions.

SEIDENFELD, P. J., and HALLETT, J., concur.